# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BUTTE ENVIRONMENTAL COUNCIL,
            *Plaintiff-Appellant,*

v.

UNITED STATES ARMY CORPS OF
ENGINEERS; UNITED STATES
FISH AND WILDLIFE SERVICE;
CITY OF REDDING,
            *Defendants-Appellees.*

No. 09-15363

D.C. No.
2:08-cv-01316-
GEB-CMK

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
February 11, 2010—San Francisco, California

Filed June 1, 2010
Amended September 1, 2010

Before: Diarmuid F. O'Scannlain, Stephen S. Trott and
Richard A. Paez, Circuit Judges.

Opinion by Judge O'Scannlain

13135

**COUNSEL**

Donald B. Mooney, of the Law Office of Donald B. Mooney, Davis, California, argued the cause for the plaintiff-appellant and filed a brief.

Kurt Kastorf, of the U.S. Department of Justice, argued the cause for defendant-appellees the U.S. Army Corps of Engineers and the U.S. Fish and Wildlife Service. Jason Walta, of the U.S. Department of Justice Environment and Natural Resources Division, filed a brief. Veronica Rowan, of the Department of the Interior, Lisa H. Clay, of the U.S. Army

Corps of Engineers, John C. Cruden, Acting Assistant Attorney General, David C. Shilton, of the U.S. Department of Justice Environment and Natural Resources Division, Lewis M. Barr, of the U.S. Department of Justice Environment and Natural Resources Division, and Meredith L. Flax, of the U.S. Department of Justice Environment and Natural Resources Division, were also on the brief.

Rick W. Jarvis, of Jarvis, Fay, Doporto & Gibson, LLP, Oakland, California, filed a brief on behalf of defendant-appellee the City of Redding.

Brandon M. Middleton, of the Pacific Legal Foundation, Sacramento, California, filed a brief on behalf of the Pacific Legal Foundation as amicus curiae in support of the defendants-appellees. M. Reed Hopper, of the Pacific Legal Foundation, was also on the brief.

---

## ORDER

The opinion filed in this case on June 1, 2010, and reported at 607 F.3d 570, is hereby amended. An amended opinion is filed concurrently with this order.

No petitions for rehearing or for rehearing en banc shall be entertained.

---

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the decisions of two federal agencies approving the construction of a business park on protected wetlands in California were arbitrary and capricious.

# I

## A

We begin by setting forth the relevant framework of the two federal statutes at the center of this appeal: the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*

### 1

Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). "Under §§ 301 and 502 of the Act, 33 U.S.C. §§ 1311 and 1362, any discharge of dredged or fill materials into 'navigable waters'—defined as the 'waters of the United States'—is forbidden unless authorized by a permit issued by the [U.S. Army] Corps of Engineers pursuant to § 404, 33 U.S.C. § 1344." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 123 (1985). The Supreme Court has upheld as reasonable the Corps' interpretation of the CWA "to require permits for the discharge of fill material into wetlands adjacent to the 'waters of the United States.' " *Id.* at 139; *see also Rapanos v. United States*, 547 U.S. 715, 742 (2006) (plurality opinion) ("[O]*nly* those wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands, are 'adjacent to' such waters and covered by the Act.").

The Corps may issue a permit pursuant to section 404 of the CWA only if conditions set forth in regulations developed by the Corps and the Environmental Protection Agency ("EPA") are met. *See* 33 U.S.C. § 1344(b). These implementing regulations provide that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative

does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Under the regulations, "[a]n alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). If a proposed activity "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (i.e., is not 'water dependent'), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." *Id.* § 230.10(a)(3).

2

The ESA directs the Secretaries of Commerce and the Interior to determine whether any species is "endangered" or "threatened," 16 U.S.C. § 1533(a)(1), and to "designate any habitat of such species which is . . . considered to be critical habitat," *id.* § 1533(a)(3)(A)(i). Under the ESA, a species' "critical habitat" includes areas occupied by the species that are "essential to the conservation of the species" and that "may require special management considerations or protection." *Id.* § 1532(5)(A)(i). It also includes areas not occupied by the species that are nonetheless essential to the species' conservation. *Id.* § 1532(5)(A)(ii).

"Section 7 of the ESA prescribes the steps that federal agencies must take to ensure that their actions do not jeopardize endangered wildlife and flora." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 652 (2007). Section 7(a)(2) provides specifically that:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary [of Commerce or the Interior], insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or

result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical . . . .

16 U.S.C. § 1536(a)(2). The ESA requires the Secretary to provide at the conclusion of consultation "a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat." *Id.* § 1536(b)(3)(A); *see* 50 C.F.R. § 402.14(h).

B

With the relevant statutory and regulatory framework in mind, we turn now to the facts of this case.

1

a

After years of researching potential sites for economic development, the City of Redding, California, decided to construct a business park on a 678-acre site located on wetlands along Stillwater Creek, and started to draft an environmental impact statement ("EIS"). The proposed site contains critical habitat for several ESA-listed species under the jurisdiction of the Secretary of the Interior, including the threatened vernal pool fairy shrimp, the endangered vernal pool tadpole shrimp, and the threatened slender Orcutt grass. These ESA-listed species occupy the site's vernal pools—shallow depressions that fill with rainwater in the fall and winter and then dry up in the spring. Final Designation of Critical Habitat for Four Vernal Pool Crustaceans and Eleven Vernal Pool Plants in California and Southern Oregon, 70 Fed. Reg. 46,924, 46,925 (Aug. 11, 2005). Their critical habitat also consists of unoccupied upland areas that serve as important sources of nutrients in the vernal pool ecosystem. *Id.*

With an eye to satisfying the conditions of both the CWA and the ESA, the City issued a draft EIS regarding the proposed development of the so-called Stillwater Business Park in February 2005. The draft EIS served as a precursor to the City's eventual application for a section 404 permit, which the City was required to obtain because the proposed development would entail the discharge of dredged or fill material into protected wetlands. The document also served to address the effects of the proposed development on ESA-listed species, which the City was required to protect because the project would involve the expenditure of federal grant money.

Based on a comparison of over a dozen potential sites, the draft EIS concluded that the Stillwater site was the least environmentally damaging practicable alternative. In support of this conclusion, the draft EIS explained that the proposed Stillwater site was "responsive" to the basic purpose of the City's project: "to increase the activity of contributory economic sectors by constructing a business park within [the City's] sphere of influence capable of attracting and accommodating diverse business and industrial users." According to the draft EIS, accomplishing this purpose required a site large enough to accommodate at least one 100-acre parcel, and the proposed Stillwater site satisfied this requirement.

The draft EIS further explained that the proposed Stillwater site met various cost, technological, and logistical feasibility criteria. It stated, for example, that the proposed site was available for acquisition; that it did not "result in adverse social or economic effects on existing development"; that it was "capable of being served by city utilities"; and that it did not entail unreasonable development costs.

Finally, the draft EIS concluded that the proposed Stillwater site was the least environmentally damaging of the potential sites that satisfied both the project's purpose and the feasibility criteria. The draft EIS acknowledged that development of the proposed site would entail the construction of var-

ious buildings, bridges, roads, and paths, as well as the extension of water, sewer, electrical, and other utility lines. It maintained, however, that the proposed site would have "less direct" effects on the wetlands and the endangered and threatened species living there than the other leading sites under consideration. Accordingly, the draft EIS announced that the Stillwater site was the City's "preferred" location for a new business park.

b

The Army Corps of Engineers reviewed and commented on the City's draft EIS. In a letter dated May 4, 2005, the Corps stated that the City's proposed Stillwater site "does not appear to be the [least environmentally damaging practicable alternative], as there may be less environmentally damaging alternatives for this project . . . . Alternatives that have fewer impacts to waters while still meeting the project's purpose and need appear to exist." The Corps argued that "the screening criteria used for selecting practicable alternatives [were] too restrictive to determine a [least environmentally damaging practicable alternative] and eliminate[ ] reasonable alternatives such as alternative 4"—a site the City had rejected because a 100-acre parcel could not be developed there without filling or altering an 8,300-foot-long tributary. Finally, the Corps noted that "[f]urther efforts to address and reduce direct, indirect, secondary and cumulative impacts within the preferred and alternative project sites appear to be practicable."

c

The EPA made similar comments in April and June 2005. Like the Corps, the EPA questioned the City's rejection of alternative 4, arguing that the City had not "articulated a compelling need for a contiguous 100-acre parcel as a centerpiece of the project." Skeptical that a business park would be "impracticable unless conceived as a single geographic entity,"

the EPA urged the City to consider developing several smaller, "disaggregated" parcels instead of a single large one.

d

In September 2005, the City issued a supplemental draft EIS, which responded to comments on the original draft. In particular, the supplemental draft EIS defended the City's decision to reject potential sites that would be unable to support at least one 100-acre parcel. It identified various potential business-park users that required parcels of at least 100 acres for their manufacturing and distribution needs, and clarified that the purpose of the project was to construct not just any business park, but "a *medium to large parcel* business park." (Emphasis added.) Furthermore, the supplemental draft EIS maintained that a park spread across several "disaggregated" parcels would not be "desirable or conducive to the users expressing interest in the area," because such a park would lack the "synergy" made possible by a single, contiguous site. According to the supplemental draft EIS, such "synergy" would result from "[c]lose product availability, sharing of resources, and streamlining [of] business practices."

In addition, the supplemental draft EIS reported that "discussions with the resource agencies over the past several months resulted in modifications to [the proposed Stillwater site] that reduced potential impacts to sensitive environmental resources." The City agreed, for instance, to modify the "footprint" of the proposed site "to reduce impacts to waters of the U.S."; to "us[e] stormwater [best management practices] to minimize impacts to receiving waters"; and to designate 296 acres of the 678-acre site as "permanent Open Space," where "[n]o ground disturbance (e.g., bike paths, roads, etc.) will be allowed." According to the supplemental draft EIS, these and other modifications reduced the "direct wetland impacts" of the proposed Stillwater project from 7.13 acres (as reported in the draft EIS) to 6.50 acres. They likewise reduced the "direct impacts" of the project on ESA-listed plants and crustaceans.

e

In November 2005, the EPA issued further comments in light of the supplemental draft EIS. One of the EPA's remaining concerns was that the City's analysis of the other alternative sites was not as detailed as its analysis of the preferred Stillwater site. The EPA was also concerned that the City had not developed an "off-site mitigation plan for unavoidable impacts to waters of the U.S. and endangered species." The EPA thus urged the City to include such a plan in its final EIS.

f

In February 2006, the City published its final EIS. In addition to compiling the City's earlier responses to comments, the final EIS devoted a section to addressing the EPA's most recent concerns. The City maintained that its discussion of alternative sites was sufficiently detailed, and directed the EPA to specific portions of the draft and supplemental EISs. The City also highlighted its proposed "compensatory mitigation" efforts—efforts "to offset unavoidable adverse impacts to wetlands, streams, and other aquatic resources." Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008). According to the final EIS, compensatory mitigation would be "achieved through on-site and off-site preservation of habitat in the Open Space Area and other suitable areas," and would involve "creation, restoration, and enhancement of wetland features." The final EIS included a mitigation monitoring program "to ensure the effective implementation and enforcement of adopted mitigation measures and permit conditions."

2

The City formally applied for a section 404 permit in March 2006, and the Corps completed its evaluation of the City's application in August 2007. Accepting that the "overall

project purpose" was "to construct a medium to large sized regional business park," the Corps agreed that the City needed a single, contiguous site that could be divided into "one 100 acre parcel and numerous parcels ranging from 20 to 50 acres." The Corps reviewed the alternative sites considered by the City, as well as one additional site—known as the Mitchell site, located directly north of the Stillwater site—that the City had not considered. Based on its review, the Corps determined that the proposed Stillwater site would have 2.145 acres of direct impact, and 2.724 acres of indirect impact, on "waters of the United States." Nevertheless, the Corps concluded that the proposed Stillwater site was the least environmentally damaging practicable alternative; in the Corps' view, the City had "clearly demonstrated that there are no practicable alternative sites available," including no "practicable alternatives having less adverse impact on the aquatic ecosystem." The Corps further concluded that issuance of a section 404 permit would not be contrary to the public interest. Accordingly, the Corps granted the City's application.

3

The Corps was not the only federal agency whose approval the City required. Section 7 of the ESA required consultation with the U.S. Fish and Wildlife Service ("FWS"), which "administers the ESA with respect to species under the jurisdiction of the Secretary of the Interior." *Home Builders*, 551 U.S. at 651. The City initiated formal consultation with the FWS in October 2006.

In December 2006, the FWS issued a written biological opinion on the City's proposed development of the Stillwater site. In the opinion, the FWS reviewed the current status of the ESA-listed species and their critical habitat. It then evaluated the direct and indirect effects of the proposed action against an "environmental baseline" of all other past and present human activities in the area. For purposes of the opinion, the FWS presumed that "indirect effects" would occur as the

result of any proposed development within 250 feet of the species' known populations. The FWS further evaluated what it called "cumulative effects"—"the effects of future State, Tribal, local or private actions that are reasonably certain to occur in the action area."

Based on its review, the FWS determined that the proposed Stillwater site contained 356.6 acres of critical habitat shared by the vernal pool fairy shrimp and the vernal pool tadpole shrimp. According to the FWS, the proposed development would destroy 234.5 acres of this critical habitat (amounting to 5.4% of the fairy shrimp's critical habitat unit 5 and 0.04% of its 597,821 acres of total critical habitat nationwide, and 5.4% of the tadpole shrimp's critical habitat unit 1 and 0.10% of its 228,785 acres of total critical habitat nationwide). The FWS also determined that the proposed development would directly affect 0.56 acres, and indirectly affect 6.42 acres, of the crustaceans' aquatic habitat. The FWS noted, however, that the City proposed to offset these effects by creating or restoring 0.56 acres of aquatic habitat, and preserving another 18.64 acres, at other on- and off-site locations.

As for the threatened slender Orcutt grass, the FWS reported that the proposed site contained 500 acres of the plant's critical habitat, of which 242.2 acres (amounting to 3.7% of the plant's critical habitat unit 2 and 0.26% of its 94,213 acres of total critical habitat nationwide) would be destroyed. According to the FWS, the proposed development would also directly affect 0.07 acres, and indirectly affect 4.33 acres, of suitable grass habitat itself. The FWS again noted, however, that the City promised to compensate for these losses by creating or restoring 0.14 acres of suitable grass habitat and preserving another 15.94 acres.

The FWS acknowledged that "the proposed project would contribute to a local and range-wide trend of habitat loss and degradation," and "to the fragmentation and reduction of the acreage of the remaining listed vernal pool species habitat."

Nonetheless, the FWS concluded that "the Stillwater Business Park project, as proposed, is not likely to jeopardize the continued existence of the . . . vernal pool fairy shrimp, vernal pool tadpole shrimp, and slender Orcutt grass." The FWS further concluded that "the proposed project would not result in the adverse modification or destruction of critical habitat" for those species.

C

In June 2008, Butte Environmental Council, a nonprofit environmental organization, filed suit against the Corps and the FWS in federal district court. The Council sought judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 704, of the Corps' decision to issue a permit for the City's proposed project and the FWS's biological opinion that the project would not adversely modify the critical habitat for endangered and threatened species. After the Council amended its complaint to add the City as a defendant, the parties filed cross-motions for summary judgment.

The district court granted summary judgment in favor of the agencies and the City. It held that "the Corps was neither arbitrary nor capricious when rationally concluding the Stillwater site was the [least environmentally damaging practicable alternative]," and that the FWS's biological opinion stated "a rational connection between the facts found and the conclusion reached." (Internal quotation marks and brackets omitted.) The Council timely appealed.

II

We review de novo the district court's grant of summary judgment. *Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 946 (9th Cir. 2008). Under the APA, we must set aside agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

> Review under the arbitrary and capricious standard is deferential; we will not vacate an agency's decision unless it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "[A] court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009) (internal quotation marks and citations omitted).

## III

The Council challenges the Corps' decision to issue the City a section 404 permit to discharge dredged or fill material into the wetlands along Stillwater Creek. The Council contends that the Corps' decision was arbitrary and capricious for a handful of reasons, none of which we find persuasive.

**[1]** First, the Council argues that the Corps failed to apply the proper presumption under 40 C.F.R. § 230.10(a)(3), which provides that where a proposed activity is not water dependent, "practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise." Here, the Corps acknowledged that the proposed project was not water dependent. It then expressly concluded, based on a review of over a dozen alternative sites, that the City had "clearly demonstrated that there are no practicable alternative sites available." Contrary to the Council's assertion, the Corps applied the proper presumption and found

that it had been rebutted under the appropriate standard. *See Bering Strait Citizens*, 524 F.3d at 948.

**[2]** Second, the Council argues that the Corps' decision to issue a section 404 permit was inconsistent with its earlier criticism of the City's draft EIS. The Council downplays, however, the extent to which the City modified its original plan in response to the Corps' comments. The City responded by, among other things, modifying the "footprint" of the proposed site "to reduce impacts to waters of the U.S." and designating 296 acres of the 678-acre site as "permanent Open Space." As a result of these and other changes, the "direct wetland impacts" of the proposed site were reduced from 7.13 to 6.50 acres. "The Corps' ultimate decision was not a reversal but simply the culmination of [years] of investigations, meetings, and reports." *Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986).

Indeed, the process worked just as it should. Agencies are entitled to change their minds, *Home Builders*, 551 U.S. at 658-59, and the Corps followed the proper procedures in doing so here. "Certainly, the Corps' initial comments were preliminary and subject to change as understanding of permit issues expanded, the factual record developed, and the mitigation plan [was] created." *Hintz*, 800 F.2d at 834. Given the back-and-forth between the City and the Corps, we have no trouble discerning the path of the agency's reasoning over time.

**[3]** Third, the Council maintains that the Corps never made an "independent determination" of the project's purpose or the size of the parcels needed. On such matters, the Council contends, the Corps "simply deferred" to the City's judgment. The record, however, suggests otherwise. Far from blindly accepting the project's stated purpose, the Corps initially expressed skepticism that the City needed a site large enough to accommodate a 100-acre parcel, arguing that "the screening criteria used for selecting practicable alternatives [were]

too restrictive." In response, the City revised its EIS to clarify that "a medium to large parcel business park" was necessary to meet the manufacturing and distribution needs of interested business-park users and to create the desired "synergy" among the park's occupants. It is true that the Corps ultimately accepted the City's revised statement of purpose and conducted its analysis in light of it. But "the Corps has a duty to consider the applicant's purpose," where, as here, that purpose is "genuine and legitimate." *Sylvester v. U.S. Army Corps of Eng'rs*, 882 F.2d 407, 409 (9th Cir. 1989). The Corps' consideration of the project's stated purpose was not unreasonable.

**[4]** Fourth, the Council argues that the Corps should not have rejected the Mitchell site as a practicable alternative. In its decision, the Corps noted that when the City entered the market for a site in 2001, the offering price of the Mitchell property was about $2.6 million, but that by 2006, when the City was ready to make a purchase, the price had risen to $12 million. The Council maintains that the Corps erred by evaluating the Mitchell property on the basis of its value in 2006 rather than 2001. The Council, however, misreads the Corps' decision. Although the Corps did mention that the offering price of the Mitchell site had risen since 2001, it nowhere relied on that fact in its substantive evaluation of the site. Rather, in rejecting the site, the Corps emphasized that the site was "not contiguous with property already owned by the City"; that "[t]he topography and geology of the site [was] not conducive for the purposes of the proposed development"; and that "[t]he amount of property available for development [was] too small to achieve the overall project purpose." In terms of cost, the Corps focused only on the cost of infrastructure, which it believed would be "substantially more" with respect to the Mitchell site than with respect to others. Given that the Corps' analysis did not reflect any consideration of the cost of acquiring the Mitchell site, the Council's challenge to the rejection of the site fails.

**[5]** Finally, the Council asserts that the Corps improperly relied on the City's proposed off-site mitigation as part of its analysis. The Council argues specifically that the Corps allowed the adoption of off-site mitigation measures to relieve the City of its responsibility to adopt the least environmentally damaging practicable alternative. But while it is true that the Corps made compensatory mitigation a condition of the permit, there is no indication that such mitigation was meant as an obligation *in place of* the City's responsibility to adopt the least environmentally damaging practicable alternative, as opposed to an obligation *in addition to* it. "[C]ompensatory mitigation is a critical tool in helping the federal government to meet the longstanding national goal of 'no net loss' of wetland acreage and function," Compensatory Mitigation for Losses of Aquatic Resources, 73 Fed. Reg. 19,594, 19,594 (Apr. 10, 2008), and nothing suggests that the Corps abused it in this case.

**[6]** In sum, the Corps stated a rational connection between the facts found and the conclusion that the proposed Stillwater site was the least environmentally damaging practicable alternative. We therefore conclude that the Corps' decision to issue the City a permit was neither arbitrary nor capricious.

IV

The Council also challenges as arbitrary and capricious the FWS's biological opinion that the City's proposed Stillwater project "would not result in the adverse modification or destruction of critical habitat for vernal pool fairy shrimp, vernal pool tadpole shrimp, or slender Orcutt grass."

A

**[7]** The Council contends that the FWS applied an improper definition of "adverse modification" under section 7 of the ESA. The regulations implementing section 7 define "destruction or adverse modification" as "a direct or indirect

alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species." 50 C.F.R. § 402.02. In *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Services*, 378 F.3d 1059 (9th Cir. 2004), we held that "the regulatory definition of 'adverse modification' contradicts Congress's express command." *Id.* at 1069. We explained that Congress enacted the ESA "not merely to fore-stall the extinction of [a] species (i.e., promote a species['] *survival*), but to allow a species to *recover* to the point where it may be delisted." *Id.* at 1070 (emphases added) (citing 16 U.S.C. § 1532(3)). "Because it is logical and inevitable that a species requires more critical habitat for recovery than is necessary for the species['] survival," *id.* at 1069, we faulted the regulations for requiring appreciable diminishment of "the value of critical habitat for *both* the survival *and* recovery of a listed species" in order for "adverse modification" to occur, 50 C.F.R. § 402.02 (emphases added). We concluded that "[w]here Congress in its statutory language required 'or,' the agency in its regulatory definition substituted 'and.' " *Gifford Pinchot*, 378 F.3d at 1070.

**[8]** According to the Council, the FWS applied a definition of "adverse modification" that did not account for the "recovery needs" of the affected species, as required under *Gifford Pinchot*. The FWS, however, expressly stated:

> This biological opinion does not rely on the regulatory definition of 'destruction or adverse modification' of critical habitat at 50 CFR 402.02. Instead, we have relied upon the statute and the August 6, 2004, Ninth Circuit Court of Appeals decision in *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service* (No. 03-35279) to complete the following analysis with respect to critical habitat.

Nothing in the biological opinion suggests otherwise. We therefore reject the Council's contention that the FWS applied

a definition of "adverse modification" that ignored the value of critical habitat for the recovery of the affected species.

B

[9] Taking a different tack, the Council contends that the FWS's finding of no "adverse modification" conflicts with its determination that the proposed Stillwater project would destroy 234.5 acres of critical habitat for the vernal pool crustaceans and 242.2 acres of critical habitat for slender Orcutt grass. *Gifford Pinchot*, however, did not alter the rule that an "adverse modification" occurs only when there is "a direct or indirect alteration that *appreciably diminishes* the value of critical habitat." 50 C.F.R. § 402.02 (emphasis added); *see Gifford Pinchot*, 378 F.3d at 1070 (taking issue only with the use of "and" instead of "or" in the regulatory definition of "adverse modification"); *id.* at 1075 (discussing appreciable diminishment). An area of a species' critical habitat can be destroyed without appreciably diminishing the value of critical habitat for the species' survival or recovery. As the FWS's ESA consultation handbook explains:

> Adverse effects on individuals of a species or constituent elements or segments of critical habitat generally do not result in jeopardy or adverse modification determinations unless that loss, when added to the environmental baseline, is likely to result in significant adverse effects throughout the species' range, or appreciably diminish the capability of the critical habitat to satisfy essential requirements of the species.

U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* 4-34 (1998) (boldface removed). The FWS's determination that critical habitat would be destroyed was thus not inconsistent with its finding

of no "adverse modification." After all, the project would destroy only a very small percentage of each affected species' critical habitat, whether viewed on a unit or nationwide basis.[1]

[10] The Council maintains, however, that the FWS's focus on the project's large-scale impact on the species' critical habitat "mask[ed] the Project's localized impact." "Focusing solely on a vast scale can mask multiple site-specific impacts that, when aggregated, do pose a significant risk to a species." *Gifford Pinchot*, 378 F.3d at 1075. But where, as here, there is no evidence in the record that "some localized risk was improperly hidden by use of large scale analysis, we will not second-guess the FWS." *Id.*

C

[11] Finally, the Council faults the FWS for failing to address the *rate* of loss of critical habitat for the species in question. Neither the ESA nor its implementing regulations, however, require that the FWS calculate a rate of loss. Rather, they require only that the FWS evaluate "the current status of the listed species or critical habitat," "the effects of the action," and the "cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g)(2)-(3). We are satisfied that the FWS faithfully conducted such analysis here.

[12] Applying the proper definition of "adverse modification," the FWS reasonably concluded that the effects of the proposed project would not appreciably diminish the value of the species' critical habitat. Accordingly, we hold that the FWS's finding of no "adverse modification" was neither arbitrary nor capricious.

---

[1]Accordingly, we express no opinion on whether the "adverse modification" inquiry under section 7 of the ESA properly focuses on the effects of an action on a particular unit of critical habitat or on total critical habitat nationwide.

V

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**